Eastern District of Kentucky
**F I L E D**

MAY - 4 2016

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION
### AT LEXINGTON

**PREFERRED CARE OF DELAWARE, INC., et al.,**

      **Plaintiffs,**

**V.**

**BILLIE KONICOV, AS ATTORNEY-IN-FACT OF BARRIE KONICOV,**

      **Defendant.**

**CIVIL ACTION NO. 5:15-cv-88-KKC-EBA**

**MEMORANDUM OPINION AND ORDER**

\*\*\* \*\*\* \*\*\*

This matter is before the Court on multiple motions submitted by the parties.

## I.  BACKGROUND

Despite the extraordinary number of filings in this case, the central dispute giving rise to this litigation is remarkably straightforward. On July 24, 2014, Barrie Konicov was admitted to a health care facility operated by Preferred Care of Delaware, Inc. (DE 1-2 at 2.) In connection with that admission, Mr. Konicov's wife, Billie Konicov, signed a number of documents, including an Alternative Dispute Resolution Agreement ("Arbitration Agreement"), in her capacity as attorney-in-fact for her husband. (DE 1-1.) Preferred Care alleges that Ms. Konicov had authority to execute the Arbitration Agreement under a "Durable Power of Attorney for Finance," which was validly executed by Mr. Konicov on August 28, 2008. (DE 4-1.) While at the health care facility, Mr. Konicov was afflicted by a number of ailments, purportedly resulting from Preferred Care's wrongful conduct. (DE 1-2 at 8.) On January 22, 2015, Ms. Konicov filed suit in Madison County Circuit court seeking relief for Preferred Care's alleged torts. (DE 1-2.)

On April 6, 2015, Preferred Care responded by filing the instant action to compel arbitration pursuant to the Arbitration Agreement. (DE 1.) There is no dispute that Ms. Konicov actually signed the Arbitration Agreement. Nor is there a claim that Ms. Konicov's state court claims fall outside the scope of the Arbitration Agreement. The only real factual dispute here is Ms. Konicov's claim that she was fraudulently induced into signing the agreement. (DE 4.) Ms. Konicov does allege lack of authority to submit claims to arbitration on her husband's behalf, indefiniteness of the Agreement's terms, and lack of consideration as defenses to enforcement. However, these are legal issues, not factual ones.

Ms. Konicov asserts fraud claims—fraud in the inducement and as part of a larger conspiracy to defraud—both as a defense to enforcement of this agreement, and as the basis for independent counterclaims. (DE 4.) In support, Ms. Konicov submits an affidavit in which she claims that Preferred Care's employee, subsequently identified as Meghan Mills, gave her multiple documents and stated "that all of the papers had to be signed or that Mr. Konicov would not be allowed to remain" at Preferred Care's facility. (DE 19-1 at ¶ 6.) Ms. Konicov avers that Ms. Mills characterized all of the documents as "standard admissions documents . . . that concerned payment arrangements for Mr. Konicov's stay at the facility, his eligibility for Medicaid, and the services that he would receive." (DE 19-1 at ¶ 7.) Ms. Mills also allegedly hurried Ms. Konicov through the documents without "an opportunity to review them or ask questions about them," instead informing Ms. Konicov what the pages were and indicating where signatures were necessary. (DE 19-1 at ¶ 9.) The process was purportedly completed in around ten minutes during which the "word arbitration was never mentioned, and the concept of arbitration was never explained or even discussed." (DE 19-1 at ¶ 9, 11.) Consequently, Ms. Konicov states she "had no idea that by signing the admissions paperwork on behalf of Mr. Konicov [she] was agreeing to arbitration or in any

way forfeiting" any rights to bring claims against Preferred Care in a court of law, and that if she had known, she would not have signed. (DE 19-1 at ¶ 12.)

In reply, Preferred Care points to several portions of the Arbitration Agreement itself that allegedly contradict Ms. Konicov's claims. First, this statement atop the Agreement's first page: "**(SIGNING THIS AGREEMENT IS NOT A CONDITION OF ADMISSION TO OR CONTINUED RESIDENCE IN THE FACILITY)**." (DE 30 at 3.) Second, Ms. Konicov's initials just below a paragraph including the following: "**THE PARTIES UNDERSTAND, ACKNOWLEDGE, AND AGREE THAT BY ENTERING INTO THIS AGREEMENT THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE THEIR DISPUTES DECIDED BY A COURT OF LAW**[.]" (DE 30 at 3.) Finally, Ms. Konicov's signature shortly following this language: "**BY SIGNING THIS AGREEMENT**, the Parties acknowledge that they have read this agreement [and] have had an opportunity to seek legal counsel and to ask questions regarding this Agreement[.]"(DE 30 at 4.) Preferred Care has also submitted Meghan Mills' affidavit, which rebuts, in some detail, every one of Ms. Konicov's allegations that might support a fraud claim. (DE 37-1.)

This Court's analysis will proceed by addressing (1) whether Preferred Care failed to join indispensable parties; (2) whether this Court has jurisdiction over two of the defendants named in Ms. Konicov's counterclaim; (3) the facial constitutionality of the FAA; (4) which of Ms. Konicov's challenges are properly submitted to an arbitrator rather than this Court; (5) whether any challenge properly before this Court is prima facie valid; (6) the FAA's constitutionality as applied here; and (7) the propriety of an injunction prohibiting further pursuit of Ms. Konicov's State Court action.

3

## II.  ANALYSIS

### A.  INDISPENSABLE PARTIES

Ms. Konicov argues that five parties are indispensable to Preferred Care's claim and, thus, the complaint must be dismissed under Federal Rule of Civil Procedure 19 because Preferred Care did not name them. The allegedly indispensable parties are two of Preferred Care's employees – Mills and Glenn Cox – and three corporations. Ms. Konicov named all of these parties except Mills as defendants in her state-court action.

"Rule 19 of the Federal Rules of Civil Procedure establishes a three-step analysis for determining whether a case should proceed in the absence of a particular party." *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 200 (6th Cir. 2001). The first step is to determine whether a party not joined is necessary under Rule 19(a). *Id.* Second, if the party is necessary, the court must next determine whether joinder is feasible, considering whether the party is subject to personal jurisdiction and if joinder will destroy the court's subject-matter jurisdiction. *Id.* Third, if joinder will destroy subject-matter jurisdiction—for instance, through joinder of a non-diverse party—the court must examine "whether in equity and good conscience the action should proceed" without the nonjoined party, i.e., whether the party is "indispensable." *Id.* If an indispensable party cannot be feasibly joined, the action must be dismissed. However, if the party is not indispensable, the action may proceed in that party's absence. *See GGNSC Vanceburg, LLC, v. Hanley*, Civil Action No. 13–106–HRW, 2014 WL 1333204, *3 (E.D.Ky. Mar.28, 2014).

For purposes of this opinion, the Court will assume that each of the five parties is necessary. Turning to the second step, feasibility, it is clear that joining the two individuals – Cox and Mills – would destroy complete diversity and divest this Court of subject-matter jurisdiction. Further, as discussed below, this Court does not have personal jurisdiction

4

over two of the corporations – Richmond Health Facilities–Kenwood GP, LLC or Preferred Care Health Facilities, Inc. Consequently, their joinder is also infeasible.

Third, this Court must address whether these four parties are indispensable such that the action must be dismissed rather than proceeding without them. Contrary to Ms. Konicov's position, a party is neither necessary nor indispensable simply because they are an alleged joint tortfeasor. *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 8 (1990) ("As potential joint tortfeasors ... [they] were merely permissive parties."). Rule 19(b) provides four factors to consider when determining whether a non-joined party is indispensable:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
>     (A) protective provisions in the judgment;
>     (B) shaping the relief; or
>     (C) other measures;
> (3) whether a judgment rendered in the person's absence would be adequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b). The central question here is whether the necessary parties' interests in the arbitration agreement render them indispensable parties to this enforcement action.

The Sixth Circuit has expressly rejected the argument that duplicative litigation and potentially inconsistent legal conclusions over an arbitration agreement are grounds for finding a party indispensable. In *PaineWebber*, the plaintiff sought to compel the heirs of its former employee to submit their state-law tort claims to arbitration. Like the instant case, *PaineWebber* sought an injunction in federal court rather than relying on a ruling from the state court. And, as here, the defendant objected to the suit on the grounds that a non-diverse employee sued in the underlying state action was indispensable because of "the potentially inconsistent legal obligations that might result from conflicting interpretations

5

of the arbitration clauses by state and federal courts." *PaineWebber*, 276 F.3d at 202. The

Sixth Circuit rejected the defendant's argument, stating that:

> Although we acknowledge the seriousness of [the defendant's]
> concerns, his characterization of the risks fails to take into
> account several important factors. These considerations
> indicate that the potential prejudice to [the defendant] or [the
> nonjoined party] if this action proceeds without [the nonjoined
> party] is minimal.
>
> As an initial matter, the possibility of having to proceed
> simultaneously in both state and federal court is a direct result
> of [the defendant's] decision to file suit naming [the plaintiff]
> and [the nonjoined party] in state court rather than to demand
> arbitration under the [parties'] Agreement.
> . . . .
> Even if the parallel proceedings were not the result of [the
> defendant's] pending state court action, the possibility of
> piecemeal litigation is a necessary and inevitable consequence
> of the FAA's policy that strongly favors arbitration.
> . . . .
> [The possibility that] the federal and state courts will reach
> conflicting interpretations of the arbitration clauses does not
> present the degree of prejudice necessary to support a
> conclusion that [the nonjoined party] is an indispensable party.

*Id.* at 202–03 (internal citations omitted).

Applying the *PaineWebber* analysis, another district court within this Circuit held

that a nursing-home administrator was not an indispensable party, notwithstanding the

administrator's status as a co-defendant in the underlying state-tort action. See *GGNSC*

*Louisville Hillcreek, LLC, v. Warner*, 2013 WL 6796421, at *3–4 (W.D. Ky. December 19,

2013) (finding that "on balance, the factors do not dictate that the Court find [the

administrator] is an indispensable party"). This Circuit's precedent is clear;  the possibility

of inconsistent rulings coupled with the burden on the defendant in pursuing duplicative

litigation are not sufficiently prejudicial to find a party indispensable. *PaineWebber*, 276

F.3d at 202–03. Thus, although there might be some prejudice and it is certainly true that

6

the state court could provide adequate relief to Preferred Care, the Court finds that none of the necessary parties are indispensable to Preferred Care's claims under Rule 19(b) and those claims may proceed without them.

## B. PERSONAL JURISDICTION

Ms. Konicov names Richmond Health Facilities-Kenwood GP, LLC, and Preferred Care Health Facilities, Inc. as defendants on her counterclaims. They both move to dismiss the counterclaims against them for lack of personal jurisdiction. "When a federal court sits in diversity, it may exercise personal jurisdiction over an out-of-state defendant only if a court of the forum state could do so." *Newberry v. Silverman*, 789 F.3d 636, 641 (6th Cir. 2015) (internal citation omitted). Personal jurisdiction in Kentucky is determined by a two-step analysis:

> First, review must proceed under KRS 454.210 to determine if the cause of action arises from conduct or activity of the defendant that fits into one of the statute's enumerated categories. If not, then *in personam* jurisdiction may not be exercised. When that initial step results in a determination that the statute is applicable, a second step of analysis must be taken to determine if exercising personal jurisdiction over the non-resident defendant offends his federal due process rights.

*Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 57 (Ky. 2011). In relevant part, Kentucky's long-arm statute provides for personal jurisdiction over an out-of-state corporation when a claim "arises from":

> (1) Transacting business in this Commonwealth;
> (2) Contracting to supply services or goods in this Commonwealth;
> . . . .
> (4) Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth, provided that the tortious injury occurring in this

7

> Commonwealth arises out of the doing or soliciting of business
> or a persistent course of conduct or derivation of substantial
> revenue within the Commonwealth

KRS § 454.210(2)(a); *Hinners v. Robey*, 336 S.W.3d 891 (Ky. 2011). Ms. Konicov has made only conclusory allegations regarding the corporations' contacts with Kentucky. Because she has not sufficiently alleged that any of her claims "arise from" any in-state activity by Richmond Health Facilities-Kenwood GP, LLC, or Preferred Care Health Facilities, Inc., this Court lacks jurisdiction under Kentucky's long arm statute.

In responding to a rule 12(b)(2) motion to dismiss for lack of jurisdiction the "plaintiff bears the burden of establishing that jurisdiction exists." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). When, as here, a defendant has submitted a well-supported motion for dismissal, "the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Id.* A court deciding a rule 12(b)(2) motion on pleadings alone must view the facts in the light most favorable to the plaintiff, and may only require a prima facie showing. *Id.* at 1459. However, mere conclusory allegations will not satisfy the "specific facts" requirement. *See Tall v. Comcast of Potomac, LLC*, 729 F. Supp. 2d 342, 346 (D.D.C. 2010) *aff'd sub nom. Tall v. Credit Prot. Ass'n*, 439 F. App'x 1 (D.C. Cir. 2011) ("plaintiffs must allege 'specific facts upon which personal jurisdiction may be based,' . . . and they cannot rely on conclusory allegations"); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) ("the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements.").

A pervasive issue with the facts Ms. Konicov alleges in support of jurisdiction is their lack of "reasonable particularity." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (holding that a prima facie jurisdictional showing requires a

plaintiff to establish "with reasonable particularity sufficient contacts between [a proposed defendant] and the forum state to support jurisdiction"). For instance, Ms. Konicov points to an industry magazine stating that "Preferred Care is the 10th largest nursing home operator in the country." (DE 36 at 8–9.) Upon closer inspection, the attached article does not mention the specific entities challenging jurisdiction here. Similarly, Ms. Konicov refers to her prior allegation that "the Preferred Care Entities promulgated policies and procedures," and that "these parties operated to deceive, mislead, and defraud the residents . . . of Kenwood." (DE 36 at 7.) She further states that the "Preferred Care entities certainly had fair warning that they may be subject to suit in Kentucky . . . they appointed a local registered agent," but overlooks that none of the entities with registered agents in the state dispute jurisdiction. (DE 36 at 11 n.1; DE 36-2.)

Only three factual allegations are specifically directed toward one or both of the parties challenging jurisdiction. First, Ms. Konicov provides evidence that all of the corporations named as defendants on her counterclaim "operate out of adjoining principal locations" in Plano, Texas. (DE 36 at 9.) Second, Ms. Konicov demonstrates that each entity shares a corporate officer. (DE 36 at 9.) Finally, Ms. Konicov points out that one of the entities challenging jurisdiction is the general partner of one of the Kentucky-based corporate Plaintiffs. Based on these three facts, she asserts that the "Preferred Care entities, including the movants, are inter-related, hold significant interests in Kenwood Health and Rehabilitation Center, and collectively operated the facility." (DE 36 at 9.) Only the final conclusion, if supported, would definitively confer jurisdiction. However, Ms. Konicov's factual premises do not support a finding that the Preferred Care entities collectively operated Kenwood Health and Rehabilitation Center.

9

As this District recently explained "[i]t is well established in this circuit that the mere ownership by a foreign parent company of an in-state subsidiary does not in itself subject the parent to the jurisdiction of such courts." *Modern Holdings, LLC v. Corning Inc.*, No. CIV. 13-405-GFVT, 2015 WL 1481443, at *5 (E.D. Ky. Mar. 31, 2015) (quoting *Miller v. Trans World Airlines, Inc.*, 302 F.Supp. 174, 178 (E.D. Ky. 1969)). Interrelatedness with and ownership of corporations amenable to suit in Kentucky cannot alone justify jurisdiction over the related or parent corporations. Ms. Konicov must demonstrate that the two entities challenging jurisdiction, *on their own*, had sufficient contacts to fall within Kentucky's long-arm statute. *Id.*

Ms. Konicov cites precedent from several courts to support her premise that "in the operation of nursing home facilities, multiple corporate defendants may operate a facility as one business." (DE 36 at 7–8.) However, the *possibility* of jurisdiction on that basis is not disputed, the issue is, as the Counter-Defendant's note, that "[t]hese cases do nothing to support the claim that this Court may exercise personal jurisdiction" in *this* case. (DE 44 at 5.) For instance, the Pennsylvania case cited by Ms. Konicov does not address personal jurisdiction, but upheld corporate negligence "as a basis for liability" against the defendant corporation where there was evidence that "it was the entity that managed all aspects of the operation of the nursing facility." *Scampone v. Grane Healthcare Co.*, 2010 PA Super 124, ¶ 71, 11 A.3d 967, 990 (2010) *aff'd in part on other grounds sub nom. Scampone v. Highland Park Care Ctr., LLC*, 618 Pa. 363, 57 A.3d 582 (2012) (finding that corporate defendant "established and administered a quality assurance program to ensure the nursing facility provided quality nursing care . . . includ[ing] establishing an operating budget" and "employees of [defendant] worked at the nursing facility and oversaw the daily operation of the nursing staff"). Certainly, if Ms. Konicov set forth specific facts tending to

10

establish Richmond Health Facilities-Kenwood GP, LLC, and Preferred Care Health Facilities, Inc. exercised a similar level of control over the Kentucky facility, jurisdiction would be warranted. However, Ms. Konicov's filings provide no such specifics.

The specific facts Ms. Konicov has alleged, even viewed in a light most favorable to her position, cannot support her contention that Richmond Health Facilities-Kenwood GP, LLC, or Preferred Care Health Facilities, Inc. controlled and trained the employees that were obtaining signatures for arbitration agreements. (DE 36 at 9.) Nor do they provide a prima facie showing that the "Preferred Care entities . . . collectively operated the facility" where the arbitration agreement was signed. (DE 36 at 9.) Ms. Konicov does not dispute that Richmond Health Facilities-Kenwood GP, LLC, and Preferred Care Health Facilities, Inc. are separately incorporated and located in Texas, or that neither company is or has ever been licensed to do business in the commonwealth.

The most that could be reasonably inferred from the facts provided "is that [the corporations] 'do[ ] business' in Kentucky *indirectly* through" related corporations. *Modern Holdings, LLC,* 2015 WL 1481443, at *7 (E.D. Ky. Mar. 31, 2015) (emphasis in original). However, in the absence of an alter-ego relationship, which Ms. Konicov does not allege, one corporation's acts within a forum cannot be imputed to a related corporation to establish jurisdiction. *Id.* "Kentucky courts have [consistently] required a course of direct, affirmative actions within a forum that that result in or solicit a business transaction." *Id.* at *6 (collecting cases). Facts tending to show direct, affirmative actions in Kentucky are precisely what Ms. Konicov has failed to allege.

In sum, both Richmond Health Facilities-Kenwood GP, LLC, and Preferred Care Health Facilities, Inc., have submitted well-supported motions to dismiss for lack of personal jurisdiction. In response, Ms. Konicov simply repeats her generalized conclusory

11

allegations of a conspiracy to commit fraud by "the Preferred Care Entities," and offers several facts that either provide no actual support for those allegations, or as a matter of Kentucky law, do not support a finding of personal jurisdiction. Thus, Ms. Konicov failed to satisfy the burden of setting forth specific facts that establish a prima facie jurisdictional showing. Accordingly, the counterclaims against Preferred Care Health Facilities, Inc. and Richmond Health Facilities – Kenwood GP, LLC, will be dismissed.

## C. FACIAL CONSTITUTIONALITY OF THE FAA

Ms. Konicov contends that the FAA is unconstitutional in so far as it substitutes state contract law for the knowing, intentional, and voluntary standard for waiver of constitutional rights—in particular, the right to trial by jury. The challenge is directed toward both the FAA's facial constitutionality and also as applied herein. For Ms. Konicov to advance a successful facial attack, she would have to establish "that no set of circumstances exists under which [§ 2] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or that the statute lacks any "plainly legitimate sweep," *Washington v. Glucksberg*, 521 U.S. 702, 740, n.7 (1997) (Stevens, J., concurring in judgments) (internal quotation marks omitted).

Ms. Konicov argues that, by applying traditional contract standards to enforcement of arbitration agreements, the FAA permits jury-trial waivers that are not necessarily knowing and voluntary. This Circuit's precedent makes clear, however, that the FAA does not foreclose challenges based on the absence of a "knowing and voluntary" waiver. *Hergenreder v. Bickford Senior Living Group, LLC* 656 F.3d 411, 420 (6th Cir. 2011). Facially, the FAA neither violates separation of powers nor alters the standard for a valid Seventh Amendment waiver.

## D. CHALLENGES SUBJECT TO ARBITRATION

Challenges to arbitration agreements can generally be placed into one of three categories: (1) challenges to whether any agreement between the parties was actually ever concluded, (2) challenges to the validity of a contract, containing an arbitration agreement, as a whole, and (3) challenges to the validity of an arbitration agreement or provision. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 741 (7th Cir. 2010).

Challenges of the first type are clearly given to the Courts, and three of the challenges here arguably fall in this group: "whether the signor lacked authority to commit the alleged principal," whether the material terms were too indefinite to form a contract, and whether the promises were supported by mutual consideration. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006); *see Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1131 (7th Cir. 1997) (analyzing consideration as a judicially-determined issue under Indiana law); Restatement (Second) of Contracts § 33 cmt. a (1981) ("If the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract."). Because they potentially address whether or not an agreement was ever consummated, these three issues are properly before this Court and they will be analyzed in subsequent sections.

Challenges of the second type, validity of an agreement containing an arbitration provision, are properly submitted to an arbitrator. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) ("the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally"). No challenge of this type is levied here because the arbitration agreement at issue is an entirely separate contract.

13

Finally, challenges of the third type, validity of an arbitration agreement, are normally addressed to the court. *Milan Exp. Co. v. Applied Underwriters Captive Risk Assur. Co.*, 590 F. App'x 482, 485 (6th Cir. 2014). Such challenges may, however, be submitted to an arbitrator if the agreement contains a separate provision delegating determination of such challenges to an arbitrator, and if that provision is not specifically challenged. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). This possibility is available even for "gateway questions of arbitrability, such as (1) whether the parties have a valid arbitration agreement or (2) are bound by a given arbitration clause, and (3) whether an arbitration clause in a concededly binding contract applies to a given controversy." *Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011).

Ms. Konicov's fraud claims challenge the *validity* or *enforceability* of an existing agreement. Such challenges fall under the broad heading of "arbitrability." *See Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 488–89 (6th Cir. 2001) (explaining the distinction between claims of fraud in the inducement and fraud in the factum, the former resulting in a *voidable* contract and the latter resulting in a *void* or "nonexistent" contract); *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 261 (Ky. Ct. App. 2007) ("Where an individual is induced to enter into the contract in reliance upon false representations, the person may maintain an action for a *rescission* of the contract.") (emphasis added); *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) (arguments that signor of arbitration agreement "did not get a copy of the contract, [ ]never read it, [ ] could not read it if he tried, and [ ] did not know what he agreed to do . . . left only . . . the question whether that contract is enforceable, and that is the kind of issue that *Prima Paint*, *Buckeye*, and *Rent–A–Center* put squarely in the arbitrator's box.").

14

This Circuit has required "clear and unmistakable evidence that contracting parties intended an arbitrator (rather than a court) to resolve questions of arbitrability." *Milan Exp. Co. v. Applied Underwriters Captive Risk Assur. Co.*, 590 F. App'x 482, 483–84 (6th Cir. 2014). This, of course, flips the usual presumption, which favors arbitrability.

If such a "delegation provision" is properly established the Supreme Court has stated that the "agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). Consequently, this additional agreement is presumed valid save upon the "grounds as exist at law or in equity" under the FAA. 9 U.S.C. § 2. In such circumstances, "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Rent-A-Ctr.*, 561 U.S.at 71.

*Rent-A-Ctr.* is particularly relevant for the instant dispute because it specifically addressed the applicability of this "severability" doctrine in the context of a challenge to an entire arbitration agreement. *Id.* There, the Court held that, before a court may intervene, a challenge must be specifically directed to the delegation provision. *Id.* at 71-72. There is no such challenge here.

Each of Ms. Konicov's challenges is captioned with a heading beginning "The Arbitration Agreement Is Invalid." No challenge is addressed to the "clear and unmistakable" delegation of fraud and misrepresentation claims to the arbitrator. Closer examination of the arbitration agreement reveals the clarity of this delegation. The "Alternative Dispute Resolution Agreement" provides in relevant part that:

> The parties voluntarily agree that any disputes covered by this Agreement (herein after referred to as "Covered Disputes") that may arise between the Parties shall be resolved *exclusively* by an ADR process that shall include . . . binding arbitration.
>
> . . . .
>
> The Parties' recourse to a court of law shall be limited to an action to enforce a binding arbitration decision entered in accordance with this Agreement or to vacate, modify or correct such a decision[.]
>
> . . . .
>
> **Covered Disputes**. This Agreement applies to any and all disputes out of or in any way relating to this Agreement . . . that would constitute a legally cognizable cause of action in a court of law sitting in the Commonwealth of Kentucky and shall include, but not be limited to . . . *fraud;* [and] *misrepresentation* . . . Covered Dispute shall include the determination of the *scope of or applicability of this Agreement.*

(DE 21-2 at 1–2 (emphasis added).) Though the Agreement does not specifically state that "enforceability" of the Agreement as a whole is directed to the arbitrator, Preferred Care's assertion of arbitrability of that issue is far from "wholly groundless." *Douglas v. Regions Bank*, 757 F.3d 460, 463 (5th Cir. 2014) (Fifth Circuit applies a "two step process: (1) did the parties unmistakably intend to delegate the power to decide arbitrability to an arbitrator, and if so, (2) is the assertion of arbitrability wholly groundless."). In short, under this Agreement arbitrability is arbitrable.

The Agreement covers "any and all disputes out of or in any way relating to this Agreement," at minimum including fraud claims "that would constitute a legally cognizable cause of action" in a Kentucky court. Ms. Konicov's counterclaims further clarify that the fraud alleged here is precisely such a dispute. *See also Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 261 (Ky. Ct. App. 2007) ("Where an individual is induced to enter into the contract in reliance upon false representations, the person may maintain an action for a rescission of the contract, or may affirm the contract and maintain an action for damages suffered on account of the fraud and deceit.") Were this not enough, the Agreement strictly

16

limits the "Parties' recourse to a court of law" to enforcement, modification, and vacatur proceedings for arbitration decisions. (DE 21-2.) There is clear and unmistakable evidence that the Arbitration Agreement "in fact . . . is broad enough in scope to encompass claims such as fraudulent inducement." *Louisville Peterbilt, Inc. v. Cox*, 132 S.W.3d 850, 855 (Ky. 2004) .

However, even if the delegation of enforceability determinations were not so clear, what is beyond dispute is that determining the "scope of or applicability" of the Agreement is directed to the arbitrator and that provision also goes unchallenged. Thus, it is for the arbitrator to decide in the first instance whether the issue of fraud regarding the enforceability of the Agreement as a whole was validly delegated. *Cf. Rhine v. Union Carbide Corp.*, 343 F.2d 12, 16 (6th Cir. 1965) ("The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract."). Absent a challenge to this specific provision, Ms. Konicov's fraud claims are not for this Court to decide. As both the Supreme Court and the Agreement make clear, this specific portion of the agreement is severable and thus, enforceable. (DE 21-2 at 3); *Rent-A-Ctr.*, 561 U.S.at 70, 72 ("a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate" and that the "underlying contract is itself an arbitration agreement . . . makes no difference").

In sum, only Ms. Konicov's challenges to her authority to contract on behalf of her husband, to the definiteness of terms, and to the validity of consideration would impact whether a contract was actually formed between the parties. Those disputes, along with the as-applied challenge, are the only remaining issues properly before this Court. Ms.

Konicov's fraud allegations, or at minimum her allegation that the agreement does not clearly and unmistakably delegate determination of the fraud claims to the arbitrator, must be addressed to an arbitrator.[1]

## E. CHALLENGES SUBJECT TO JUDICIAL DETERMINATION[2]

"The party seeking to enforce an arbitration agreement has the burden of establishing its existence, but once prima facie evidence of the agreement has been presented, the burden shifts to the party seeking to avoid the agreement[;] the party seeking to avoid the arbitration agreement has a heavy burden." *Louisville Peterbilt, Inc. v. Cox*, 132 S.W.3d 850,857 (Ky. 2004) (citation omitted).

### 1. Authority

Preferred Care makes several challenges to the validity of the Kentucky Supreme Court's recent decision regarding the ability of attorneys in fact to bind principals to arbitration. *Extendicare Homes, Inc. v. Whisman*, No. 2013-SC-000426-I, 2015 WL 5634309 (Ky. Sept. 24, 2015), as corrected (Oct. 9, 2015). This Court need not reach the substance of those disputes because, in any event, the power of attorney at issue here satisfies the standard announced by *Whisman*. Under the heading "Power relating to claims and litigation," the Power of Attorney authorized Ms. Konicov to "submit to arbitration, settle, and propose or accept a compromise with respect to a claim or litigation." (DE 19-3 at 8–9.)

---

[1] There is of course the possibility that an Arbitrator might find that the fraud determinations were not clearly and unmistakably delegated to arbitration. Whether such a decision could be vacated based on the language herein is not at issue before this Court.

[2] Preliminarily, it should be noted that, as stated previously, these challenges only "arguably" address whether formation occurred at all. To the extent that they do not, they—like the fraud claim—would be subject to the *Rent-A-Ctr.* delegation and severability analysis. However, given that these arguments are insufficient to avoid arbitration as a matter of law, such analysis would not impact this Court's final determination on the motion to compel. Consequently, this Court will not attempt to apply *Rent-A-Ctr.* for claims that, unlike fraud claims, are not as obviously delegated to the arbitrator by the Arbitration Agreement. This decision is further supported by the dearth of binding precedent interpreting *Rent-A-Ctr.* and the "clear and unmistakable" delegation requirement upon which this Court could rely.

18

"[T]he principal's explicit grant of authority delineated in the power-of-attorney document is the controlling factor in assessing the scope of the powers of the attorney-in-fact." *Whisman*, 2015 WL 5634309 at *15. Kentucky's highest court has previously indicated that "[a] reasonable agent should consider whether the principal intended to authorize the commission of collateral acts fraught with major legal implications for the principal." *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 593 (Ky. 2012). It is unclear what a reasonable agent could have inferred by being empowered to "submit to arbitration" other than that Mr. Konicov intended to authorize his wife to do just that. Though authority to contract is a formation issue, Ms. Konicov has not established a well-founded claim that authority was lacking. Accordingly, no attendant right to a hearing attaches to this defense. *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) (entitlement to a hearing when formation is "in issue" under the FAA requires "the party opposing arbitration [to] show a genuine issue of material fact").

### 2.  *Definiteness of Terms & Terms Incorporated by Reference*

Ms. Konicov challenges the Arbitration Agreement's "Arbitration Process and Procedure" section as being too indefinite for there to have been a meeting of the minds necessary for contract formation. (DE 21 at 9.) Ms. Konicov points out that the procedures "cannot be found anywhere within the four corners of the agreement" and that to the extent the section seeks to incorporate terms by reference they do not do so with adequate clarity. (DE 21 at 7.) This, Ms. Konicov claims, means that the agreement "failed to set out the material terms" and, thus, this Court could not "determine what the terms of this agreement require of the parties or if those terms have been breached." (DE 21 at 9.) This Court cannot agree.

19

"Almost never are all the connotations of a bargain exactly identical for both parties; it is enough that there is a core of common meaning sufficient to determine their performances with reasonable certainty or to give a reasonably certain basis for an appropriate legal remedy." Restatement (Second) of Contracts § 20 (1981); *See also* Restatement (Second) of Contracts § 33 cmt. b. (1981) ("The test is not certainty as to what the parties were to do nor as to the exact amount of damages due to the plaintiff; uncertainty may preclude one remedy without affecting another."). "A court should provide a remedy if the parties intended to make a contract and the contract's terms provide a sufficiently certain basis for determining both that a breach has in fact occurred and the nature of the remedy called for." *Texas v. New Mexico*, 482 U.S. 124, 129 (1987) (citing Restatement (Second) of Contracts § 33(2)); *accord Walker v. Keith*, 382 S.W.2d 198, 200 (Ky. 1964) ("Like other contracts . . . the provision for a renewal must be certain in order to render it binding and enforceable . . . the certainty that is required is such as will enable a court to determine what has been agreed upon.").

This contract, signed by both parties, leaves no doubt that the parties agreed to arbitrate. It contains a statement in all capital letters directly above the initials of both parties certifying that:

> THE PARTIES UNDERSTAND, ACKNOWLEDGE, AND AGREE THAT BY ENTERING INTO THIS AGREEMENT THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE THEIR DISPUTES DECIDED BY A COURT OF LAW OR TO APPEAL ANY DECISION OR AWARD OF DAMAGES RESULTING FROM THE ADR PROCESS EXCEPT AS PROVIDED HEREIN.

(DE 21-2 at 4.) The nature of the remedy called for is unmistakably "an ADR process that shall include mediation and, where mediation does not successfully resolve the dispute, binding arbitration." (DE 21-2 at 1.)

20

Moreover, "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Consultants & Builders, Inc. v. Paducah Fed. Credit Union*, 266 S.W.3d 837, 840 (Ky. Ct. App. 2008) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. at 445–46 (2006)). "Whether the agreement to arbitrate is entire or severable turns on the parties' intent at the time the agreement was executed, as determined from the language of the contract[.]" *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 890 (6th Cir. 2002). The contract explicitly includes a severability provision clarifying that if "any provision of this Agreement is determined . . . to be invalid . . . the remainder of this Agreement . . . shall remain valid, enforceable, and binding on the parties." (DE 21-2 at 3.) Thus, to the extent the mediation provisions challenged here are vague, they are readily severed.

As stated above, the language of this contract clearly indicates that the parties intended to resolve their disputes through arbitration. The Agreement identifies a method for selecting an arbitrator. (DE 21-2 at 1–2.) The method for selecting an arbitration location is fully set forth. (DE 21-2 at 3.) The parties' right to counsel, right to discovery, and the arbitrator's ability to subpoena witnesses during that process are explicitly noted. (DE 21-2 at 3.) This Court cannot justifiably find that no agreement to arbitrate was ever formed purely by virtue of the Agreement's failure to incorporate "Rules of Procedure" that are referenced almost exclusively in the Agreement's "Mediation" section. (DE 21-2 at 3.) The terms of the Agreement are sufficiently certain to enable this "court to determine what has been agreed upon." *Walker v. Keith*, 382 S.W.2d 198, 200 (Ky. 1964). The parties, at minimum, agreed to arbitrate.

21

### 3. *Validity of Consideration*

Ms. Konicov's final contention, that "[t]he consideration allegedly supporting this contract simply does not exist," is equally unpersuasive. (DE 21 at 14.) The Agreement provides that:

> The Parties agree that the speed, efficiency and cost-effectiveness of the ADR process, together with their mutual undertaking to engage in that process, constitute good and sufficient consideration for the acceptance and enforcement of this Agreement.

(DE 21-2 at 1.) Ms. Konicov's argument ignores the majority of this provision claiming only that the "cost-effectiveness allegedly bargained for in this agreement is illusory, the contract is not supported by consideration." (DE 21 at 15.) However, both Kentucky and federal courts agree that mutual promises to submit equally to arbitration constitute adequate consideration. *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013); *cf. Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 379 n.6, 380 (6th Cir. 2005); *see also Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 869 (7th Cir. 1985) ("If the agreement of one party to arbitrate disputes is fully supported by the other party's agreement to do likewise, there is no need to look elsewhere in the contract for consideration for the agreement to arbitrate[.]").

## F. AS-APPLIED CONSTITUTIONALITY OF THE FAA

Ms. Konicov argues that the FAA is unconstitutional as applied to her and her husband because she did not knowingly, voluntarily and intelligently waive her husband's right to a jury trial in a civil case when she signed the arbitration agreement on his behalf. However, Ms. Konicov's husband did not have a right to a jury trial with regard to future disputes with the nursing home at the time Ms. Konicov signed the arbitration agreement.

22

"[T]he Seventh Amendment was never intended to establish the jury as the exclusive mechanism for factfinding in civil cases." *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 460 (1977). "[T]he right to a jury trial turns not solely on the nature of the issue to be resolved but also on the forum in which it is to be resolved." *Id.* at 460–61. Constitutional rights are not omnipresent. *Kirby v. Illinois*, 406 U.S. 682, 688 (1972) ("a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him"). The Seventh Amendment provides only that "[i]n *Suits* at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII (emphasis added); *cf.* U.S. Const. amend. VI ("In all criminal *prosecutions*, the accused shall enjoy the right to a speedy and public trial . . . and to have the Assistance of Counsel for his defence.") (emphasis added). Thus, the right to trial by jury is only preserved for "suits" properly heard in a judicial forum.

Disputes within the ambit of an arbitration agreement do not carry a right to a trial by jury because no "suit" within the meaning of the Seventh Amendment ever arises. *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 421 (6th Cir. 2011) ("Yet '[i]f the claims are properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes.'") (quoting *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 506 (6th Cir.2004)). As one district court from a sister circuit has explained: "The Seventh Amendment does not confer the right to a trial, but only the right to have a jury hear the case once it is determined that the litigation should proceed before a court." *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 957 F. Supp. 1460, 1471 (N.D. Ill. 1997).

As a matter of federal law, this Circuit has held that "in the context of an express contractual waiver the objecting party should have the burden of demonstrating that its

23

consent to the provisions was not knowing and voluntary;" a presumption of validity is given "in the interest of liberty of contract." *K.M.C. Co.*, 757 F.2d at 758 (internal citations omitted). If a delegation provision goes unchallenged, this presumption controls, and arbitration is the appropriate forum. Accordingly, properly delegated claims present no "'legal' action before a tribunal customarily utilizing a jury as its factfinding arm." *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 461 n.16 (1977). Delegation of factfinding in such actions is all that the Seventh Amendment exempts from congressional authority. *Id.* The FAA's application to claims properly before an arbitrator cannot infringe on the jury trial right because those disputes carry no such right.

The FAA preserves the right to trial by jury if and when a well-founded challenge to formation of an agreement is raised.[3] No such challenge exists here. *See supra* Part E. Nor was a challenge to the delegation provision ever raised. A valid delegation provision, as was found here, does not waive the right to a trial by jury because that right only attaches if the dispute is found to be non-arbitrable. The provision at issue delegates this antecedent determination to an arbitrator. If the arbitrator determines that the dispute is non-arbitrable then a "suit" to which a potentially well-founded challenge is directed—the fraud counterclaims—arises for the first time. Ms. Konicov's fraud claims are not "suits" properly before this Court, but are instead "disputes" properly before an arbitrator. Any impact the

---

[3] The requirement that a formation challenge be well-founded, i.e., creates a genuine issue of material fact, before being considered "in issue" for purposes of the FAA is based on the civil summary judgment standard. *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) )("The required showing mirrors that required to withstand summary judgment in a civil suit."). This Court will presume Defendant's challenge does not extend to the constitutionality of denying the right to jury trial when the summary judgment standard is satisfied.

FAA has on resolution of such disputes is outside the Seventh Amendment's scope and within Congressional authority. *Atlas Roofing Co.*, 430 U.S. at 461 n.16.

As applied here, the FAA does not alter the standard for a valid waiver of a constitutional right. The FAA and the Supreme Court simply require that a challenge be specifically directed to a delegation provision "before the court will intervene." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010). In the absence of a specific challenge to a delegation provision, there is no court intervention, and consequently, no "suit" to which the knowing and voluntary standard for a Seventh Amendment waiver might apply.

## G. Enjoining Pursuit of Pending State Action

Having found that Ms. Konicov must submit her claims to arbitration, this Court must decide whether she should be enjoined from pursuing her parallel action in State Court. This Court finds that such an injunction is necessary; accordingly Ms. Konicov will be enjoined from proceeding with her State Court action. "Although the FAA requires courts to stay their own proceedings where the issues to be litigated are subject to an agreement to arbitrate, it does not specifically authorize federal courts to stay proceedings pending in state courts." *Great Earth*, 288 F.3d at 893 (quoting *Ultracashmere House, Ltd. v. Meyer*, 664 F.2d 1176, 1180 (11th Cir.1981)) (internal citations omitted). For this reason, "the district court's authority to enjoin state-court proceedings is subject to the legal and equitable standards for injunctions generally, including the Anti Injunction Act." *Id.* Pursuant to the Anti Injunction Act, "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, *or to protect or effectuate its judgments.*" 28 U.S.C. § 2283 (emphasis added).

25

An injunction in this case "properly falls within the exception for injunctions 'necessary to protect or effectuate [this Court's] judgments.' " *Great Earth*, 288 F.3d at 894. This Court has determined that the Parties entered into a binding arbitration agreement covering Ms. Konicov's claims and, thus, that she shall be compelled to arbitrate. Consequently, it is necessary to enjoin Ms. Konicov from pursing her claims in any alternative forum, including State Court. Otherwise, Ms. Konicov would be permitted to circumvent her arbitration agreement and, in so doing, circumvent this Court's judgment that she be compelled to arbitrate her claims.

### III.  CONCLUSION

For all these reasons, **IT IS ORDERED** that:

1.  Defendant's motions to dismiss (DE 23) and for summary judgment (DE 21; DE 31) are **DENIED**;

2.  Plaintiffs' motion to compel arbitration and enjoin the State Court proceedings (DE 8) is **GRANTED**;

3.  Preferred Care Health Facilities, Inc., (DE 25) and Richmond Health Facilities – Kenwood GP, LLC's (DE 28) motions to dismiss are **GRANTED**;

4.  Defendant Billie Konicov is **COMPELLED** to submit her claims to arbitration according to the terms of her agreement and **ENJOINED** from proceeding with her state court action;

5.  All other pending motions are **DENIED AS MOOT**;

6.  The Court will stay this proceeding until the ordered arbitration concludes.

Dated May 4, 2016.



Signed By:
Karen K. Caldwell
United States District Judge